**IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

UNITED STATES OF AMERICA

v.                                    CRIMINAL  ACTION  NO. 3:11-00202

EDWARDO MANUELL FORSYTHE
HOPE LANITA JACKSON-FORSYTHE

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is Defendants' Joint Motion to Suppress Evidence. [ECF No. 53].  The Court held a hearing on the motion on December 5, 2011, and ordered additional briefing.  Upon consideration of the testimony at the hearing and the arguments of the parties, the Court **DENIES** Defendants' motion.   Despite evidence that officers probably entered the hotel room illegally, before a search warrant was obtained, the Court is constrained to apply the "independent source doctrine" derived from Supreme Court and Fourth Circuit precedent.

**I.
FACTS**

For at least a year, the Huntington Violent Crime and Federal Drug Task Force was conducting an undercover investigation of Derrick Lewis.  Corporal Paul Hunter of the Huntington Police Department testified that Mr. Lewis was the target of several controlled drug buys.  On or about August 19, 2011, the police arranged for a meeting at an apartment at 2925 Beverly Road in Huntington between Mr. Lewis and a confidential informant.  At the meeting, the informant paid Mr. Lewis for a prior drug debt, and Mr. Lewis fronted him heroin to be paid for at a later time.

Three days later, on August 22, 2011, the informant again met Mr. Lewis at the same address, and the informant asked about getting more heroin.  Mr. Lewis replied that he was out, but he would be getting more within the next few hours.  The informant left the scene at approximately 4:50 p.m.  However, upon learning of the information given to the informant, the police stayed and maintained surveillance to watch for any activity.

At approximately 7:00 p.m., officers observed Mr. Lewis leave in a rented white Chevy Traverse being driven by an unknown white female.  Officers followed the vehicle to a nearby Wal-Mart.  Corporal Hunter stated he observed Mr. Lewis leaning in the front passenger seat and he appeared to be on the telephone.  The female drove the Traverse to a parking spot about halfway into the parking lot.  After a period of time, Corporal Hunter saw a gray Ford Focus approach.  Mr. Lewis got out of the Traverse and into the backseat of the Focus.  Although unidentified at the time, the Focus was driven by Defendant Edwardo Forsythe and his wife, Defendant Hope Jackson-Forsythe, was the front passenger.

Mr. Forsythe drove the Focus out of the parking lot, and the Traverse followed it. The police followed in three or four unmarked cars and planned to make a stop.  However, before they could execute a stop, the Focus pulled onto the lot of a nearby gas station and stopped near the diesel gas pump.  Corporal Hunter pulled behind the Focus, and another officer, Sergeant Darrell Booth, pulled his vehicle in front of the Focus blocking its path.  The Traverse also pulled onto the lot.

-2-

Believing that either a drug transaction had just occurred or was in the process of occurring, officers got out of their vehicles, drew their weapons, and told the occupants of the Focus to get out of the car and put their hands up.  Corporal Hunter stated that Mr. Lewis reached for the waistband of his pants.  After some resistance, Mr. Lewis was pulled from the vehicle with his pants falling off.  The Forsythes also were removed from the car.  Corporal Hunter testified he believed at the time that Mr. Lewis and the Forsythes may have been armed because he previously was told by another individual that Mr. Lewis carried a gun and, in his experience of doing thousands of drug investigations, he knew it to be common for drug suppliers to carry firearms when dealing with other suppliers.

The officers conducted pat downs of the Forsythes and Mr. Lewis.  Nothing was found at the time on Mrs. Forsythe or Mr. Lewis.  However, Detective Ben Butler patted Mr. Forsythe down and found a large lump in his front pocket.  Detective Butler stated that Mr. Forsythe told him that it was his prescription.  Detective Butler asked Mr. Forsythe if he could look at it, and Mr. Forsythe said "go ahead."  Inside his pocket were 30 milligram Roxicontin pills and 40 milligram Opana pills, individually wrapped in cellophane bags and then all placed in a single cellophane bag.

A drug dog also was brought to the scene to sniff the vehicle.  The dog indicated on the rear passenger side where Mr. Lewis was seated and also on the exterior of the car.  The vehicle was searched and officers found a ticket stub indicating the Forsythes possibly had traveled from California, to Detroit, to Huntington earlier that day.  Officers also found a hotel card key for the

-3-

Marriott Inn and Suites in Huntington.  According to Corporal Hunter, Mrs. Forsythe denied they were staying at the hotel and stated they were staying in Kentucky.  Defendants and Mr. Lewis were transported to the Huntington police headquarters at approximately 8:02 that evening.  Once there, Mr. Lewis was searched incident to arrest and Opana and a large amount of Roxycontin pills were found in a bag in his buttocks area.  The pill were the same type found on Mr. Forsythe.

Corporal Hunter and Sergeant Booth left the scene of the stop and went directly to the hotel where it was confirmed that Mrs. Forsythe rented room 319 that day.  During direct and cross examination, Corporal Hunter made no mention of entering the room until after he obtained a search warrant at approximately 10:34 p.m.  However, defense counsel called the General Manager of the hotel, David Stephenson, who testified that a computerized printout of the lock activity for Room 319 showed that the card key issued to the Forysythes opened the door at 8:16 p.m.[1] and again at 9:19 p.m.[2]  The door was not opened again until 1:47 a.m.[3]  Counsel also called Mr. Forsythe who testified that he saw his and his wife's luggage at the police station around 9:55 to 10:00 p.m. that evening.

_____

[1]The printout actually showed the time as 8:04 p.m.  However, Mr. Stephenson explained that there was a 12 minute discrepancy between the lock clock and the actual time, so the real time was 8:16 p.m.

[2]The printout showed 9:07 p.m., but the actual time was 9:19 p.m.

[3]The printout reflected a time of 1:35 a.m.  When the door was opened at that time, it was by a different key.  Mr. Stephenson stated his night auditor told him that she went to check on the condition of the room, and he believed she may have made a new key to open the door.

After hearing the testimony about the door being opened on two occasions before the search warrant being issued, the Government recalled Corporal Hunter back to the stand. Corporal Hunter explained that, after confirming that Hope Jackson-Forsythe rented the room, he and Sergeant Booth used the Fortsythes' key to secure the room to make sure no one was there. He said they did not search anything at that time. He also testified that he did not see any seizable evidence in the room at that time. Corporal Hunter then left the room and Sergeant Booth stayed there. Corporal Hunter stated that, when he got the warrant, he called and told the officers on the scene to start the search. He could not explain why the door was reopened at 9:19 p.m. and not opened again until 1:47 a.m. Sergeant Booth was not present for the hearing.[4]   Items taken from the room, as reflected on the property receipt, included a large quantity of oxycodone and Opana pills and Defendants' luggage.

## II.
## DISCUSSION

In their joint motion to suppress, Defendants argue that their vehicle was illegally stopped and their hotel room illegally searched. Therefore, they move that all the evidence seized be suppressed. The Court will address the stop and the room search one at a time.

First, as explained at the hearing, this Court finds the police were justified in stopping the car and searching Defendants at the scene. Under *Terry v. Ohio*, 392 U.S. 1 (1968), "an officer

---

[4]The Government requested the right to call Sergeant Booth at a later time about what happened in the room while Corporal Hunter was getting the search warrant. Counsel for Mr. Forsythe strenuously objected and represented that he met with the Assistant United States Attorney the preceding week and he was assured that the Government would do its best to have the officers present so he did not need to issue subpoenas.

may conduct a brief investigatory stop where the officer has reasonable suspicion that criminal activity may be afoot." *United States v. Perkins*, 363 F.3d 317, 321 (4th Cir.2004) (citations omitted).  The Fourth Amendment requires a temporary stop to be "justified at its inception" and "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry,* 392 U.S. at 20.  A suspect may be stopped by the police when they can "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id*. at 21 (footnote omitted).  A court must view those facts "against an objective standard: would the facts available to the officer at the moment of the seizure or the search warrant a man of reasonable caution in the belief that the action taken was appropriate?" *Id.* at 21–22 (internal quotation marks, citations, and footnote omitted).  "Context is important in evaluating a reasonable suspicion determination[.]" *United States v. Branch*, 537 F.3d 328, 338 (4th Cir. 2008).

Here, the Court has no difficulty finding the police had reasonable suspicion in blocking Defendants car from leaving the gas station.  At the time, they knew Mr. Lewis was in the car and he had participated in several controlled drug buys.  Three days earlier, Mr. Lewis fronted an informant heroin.  On the day of the stop, the informant met with Mr. Lewis and asked him about getting more heroin.  Mr. Lewis purportedly told the informant that he was out, but he would be getting more within the next few hours.  Police maintained their surveillance to watch for activity.

Just over two hours passed when Mr. Lewis left in the Traverse and traveled to the nearby Wal-Mart parking lot.  Mr. Lewis appeared to be talking on the phone.  Neither Mr. Lewis, nor the driver, went into the store.  Instead, when the Focus arrived, Mr. Lewis got into the back

seat, and the Focus took off with the Traverse following behind it.  Clearly, this behavior, coupled

with the fact the police knew Mr. Lewis was a drug dealer and the informant told the police Mr.

Lewis was going to get more heroin within a few hours, gave the police a reasonable basis to suspect

that Mr. Lewis was engaging in a drug transaction with Defendants.  Thus, the Court rejects

Defendants' argument that the police had no reasonable suspicion to stop Defendants' car.

In addition, once police stopped the car, officers had every reason to believe that the

occupants may be armed.  Corporal Hunter specifically testified he was told that Mr. Lewis carried

a firearm and, in his lengthy experience investigating drug crimes, he was aware that firearms were

often used when suppliers were dealing with other suppliers.  It is beyond dispute that "[p]olice may

conduct a patdown search without a warrant if, under the totality of the circumstances, the officer

has an articulable, reasonable suspicion that a person is involved in criminal activity and that he is

armed." *United States v. Raymond*, 152 F.3d 309, 312 (4th Cir. 1998) (citing *Terry*).  Under these

circumstances, both elements of this test are easily met.  Therefore, the Court finds that neither the

stop, nor the patdown searches, violated Defendants' constitutional rights.[5]  Accordingly, the Court

**DENIES** Defendants' motion to suppress the evidence obtained during the stop.

Next, Defendants argue it is obvious from the computerized printout of the lock

activity for Room 319, and Mr. Forsythes' testimony that he saw his luggage at the police station

---

[5]Defendants do not argue that there was no probable cause to search the car under the circumstances and following positive indications by a drug dog brought to the scene. *See Branch*, at 340 n.2 (4th Cir. 2008) (stating "it is well settled that a 'positive alert' from a drug detection dog, in and of itself, provides probable cause to search a vehicle").

around 10:00 p.m., that the police searched the room prior to obtaining the search warrant.  Even if true, however, the Court finds Defendants' motion fails because of the inevitable discovery and independent source doctrines.

As explained by the United State Supreme Court in *Murray v. United States*, 487 U.S. 533 (1988), the inevitable discovery doctrine allows the admission of tainted evidence if such evidence would have been inevitably discovered through an independent source. 487 U.S. at 539. In *Murray*, federal law enforcement agents made a forced entry into a warehouse without a warrant. *Id*. at 535.  Once inside, agents observed numerous bales of marijuana in plain view.  Agents did not seize the bails but, instead, left the warehouse and applied for a search warrant. *Id.*  The agents made no mention of entering the warehouse or any of their observations inside the warehouse when they applied for the search warrant. *Id*. at 535-36.  After obtaining the warrant, agents reentered and seized the marijuana and notebooks with the names of customers. *Id*. at 536.  The defendants moved to suppress the evidence by arguing it was tainted because the initial entry was without a warrant. *Id*.

In considering the issues presented, the Supreme Court found that, despite the fact agents knew about the marijuana at the time of the illegal entry, they would have discovered the marijuana when they reentered the warehouse pursuant to the warrant. *Id*. at 541.  The Supreme Court stated that the policy underlying the independent source doctrine is "that, while the government should not profit from its illegal activity, neither should it be placed in a worse position than it would otherwise have occupied." *Id*. at 542.  Thus, the Supreme Court held that, "[s]o long

-8-

as a later, lawful seizure is genuinely independent of an earlier, tainted one . . . there is no reason why the independent source doctrine should not apply." *Id.*  The Supreme Court stated that the ultimate question to be asked "is whether the search pursuant to warrant was in fact a genuinely independent source of the information and tangible evidence at issue[.]" *Id.*  Although the district court found the agents did not reveal the warrantless entry or their observations to the magistrate judge in obtaining the warrant, the district court made no finding that the agents would have sought the warrant even if they had not made the warrantless entry.  Therefore, the Supreme Court remanded the case for that question to be resolved. *Id.* at 543-44.

In summarizing the holding in *Murray*, the Fourth Circuit stated in *United States v. Bullard*, 645 F.3d 237 (4th Cir. 2011), that in order for the independent source doctrine to apply, the application for the search warrant first must not include any recitation of officers' earlier unlawful observations and, second, the court must find the officers would have sought the warrant despite the unlawful search. *Id.* at 244.  In *Bullard,* the police entered a hotel room upon valid third-party consent. *Id.* at 243.  Once inside, officers observed drug paraphernalia and a substance appearing to be cocaine residue in plain view.  Officers also could smell narcotics. *Id.*  Officers then proceeded to conduct an extensive search, which included cabinets and closed luggage. *Id.* at 241 & 244.  Upon finding cocaine in the luggage,[6] the search stopped and backup was requested.  Shortly thereafter, the defendant returned to the room and was apprehended and found to be in possession of cocaine and currency.  A police officer then went to obtain a search warrant for the room. *Id.* at 241.  Upon

---

[6]Inside the luggage was a lunchbox containing cocaine. *Id.* at 241.

execution of the search warrant, officers seized drugs, paraphernalia, and a large amount of cash. *Id*.

The defendant did not challenge the admissibility of the evidence found in plain view, but he did challenge the admissibility of the other evidence found. *Id*. at 244.  The Government conceded that the initial search of the cabinets and luggage exceeded the scope of a protective sweep but, nonetheless, the Fourth Circuit found that evidence, and the evidence obtained on the defendant's person, admissible under *Murray. Id*.  First, the defendant agreed that the officers did not include any of the evidence taken from the search of his luggage in their application for the search warrant. *Id*.  Second, the Fourth Circuit stated that, prior to entering the hotel room, the police officers had ample reason to believe drug activity was occurring in the room and the evidence showed the officers intended to request a search warrant before they ever searched the defendant's luggage. *Id*. at 244-45.  Therefore, the Fourth Circuit held that "the independent source doctrine saves any overreaching during the officers' initial search of . . . [the defendant's] luggage from tainting the evidence later obtained pursuant to a valid search warrant." *Id*. at 245.[7]

In applying the criteria of *Murray* and *Bullard* to the facts of this case, the Court finds that, even if the evidence from the hotel room was seized by police prior to the issuance of the warrant, it is still admissible.  In this case, the defendant concedes the first criteria is met because there is nothing in the application for the warrant which indicates officers already had entered the

_____

[7]The defendant also challenged the search of his body, but the Fourth Circuit rejected his argument by finding that,  even without considering the drugs found in his luggage, the officers had probable cause to arrest him and search him incident to arrest. *Id.*

hotel room, nor did they list any evidence ultimately found in the room.  In fact, Corporal Hunter stated he did not see any seizable evidence when they conducted their initial sweep of the room. Next, the Court finds it is beyond dispute that Corporal Hunter left the hotel to get a warrant before the door was reopened at 9:19 p.m.  Assuming that is when the officers reentered the room and began the search, it had absolutely no role in Corporal Hunter applying for and receiving the warrant.  The warrant he obtained was completely and genuinely independent of anything produced by illegal search conducted by the officers at the scene after he left.  Thus, any evidence seized prior to the time Corporal Hunter phoned to tell officers at the scene that he had the warrant, including the luggage and its contents, would have been inevitably discovered when officers searched pursuant to the warrant.  Although the Court is not pleased with the manner in which this search may have occurred and cautions officers that in future cases the independent source doctrine may not be so clear cut, the Court finds the facts of this case fall within the doctrine and the evidence ultimately would have been discovered after the warrant was issued.  Therefore, the Court finds the evidence taken from the hotel room is admissible.

### III.
### CONCLUSION

Accordingly, having rejected Defendants' arguments with regard to the car stop and the search of the hotel room, the Court **DENIES** Defendants' motion.

The Court **DIRECTS** the Clerk to send a copy of this written Opinion and Order to counsel and the defendant, the U.S. Attorney's Office, the U.S. Probation Office, and the U.S. Marshals' Service.

ENTER:        January 10, 2012

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE